IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CLAUDIA WINWARD                          )
                                         )
                    Plaintiff,           )        Civ. No. 09-34-SLR
                                         )
        v.                               )
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
                    Defendant.           )
                                         )

_____

Gary L. Smith, Esquire of Gary L. Smith Attorney at Law. Counsel for Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Dina White Griffin, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Erica Perkins, Esquire, Assistant Regional Counsel of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

_____

**MEMORANDUM OPINION**

Dated: October 9 , 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Claudia Winward ("plaintiff") appeals from a decision of Carolyn W. Colvin,

Acting Commissioner of Social Security ("defendant"), denying her application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"),

42 U.S.C. §§ 401-434, 1381-1383f.  The court has jurisdiction pursuant to 42 U.S.C. §

405(g).[1]

Currently before the court are the parties' cross-motions for summary judgment.

(D.I. 15, 16)  For the reasons set forth below, plaintiff's motion will be denied and

defendant's motion will be granted.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB on April 19, 2006 alleging disability beginning

on July 1, 2000 for depression.  (D.I. 8 at 24, 27-29)  Plaintiff's claim was initially denied

on June 15, 2006 and after reconsideration on July 18, 2006.[2]  (Id. at 49-50)  On

January 16, 2010, after a hearing on December 3, 2009, the ALJ issued an unfavorable

decision, finding that plaintiff was not disabled under the Act for the relevant time period

---

[1]Under § 405(g), [a]ny individual, after any final decision of the Commissioner of
Social Security made after a hearing to which he was a party . . . may obtain a review of
such decision by a civil action commenced within sixty days after the mailing to him of
notice of such decision. . . . Such action shall be brought in the district court of the
United States for the judicial district in which the plaintiff resides . . . . 42 U.S.C. §
405(g).

[2]On February 9, 2008, after a hearing on August 4, 2006, the ALJ issued a
decision finding that plaintiff was not disabled under the Act.  (D.I. 8 at 51-65)  Because
of a defective recording of the hearing, the Commissioner voluntarily remanded the
case.  (Id. at 66-73)

from July 1, 2000 to March 31, 2003. (*Id.* at 7-21) After an unsuccessful appeal to the
Appeals Council, plaintiff appealed to this court for review of the January 16, 2010
decision. (*Id.* at 1-3)

## B. Medical History

### 1. Mental health history before the relevant time period

Plaintiff sought help for depression from Richard Cruz, M.D. ("Dr. Cruz")

beginning in June 1999. (D.I. 8 at 225, 227) Dr. Cruz prescribed various psychotropic

medications in increasing dosages throughout plaintiff's treatment. (*Id.* at 214-27) Dr.

Cruz generally described plaintiff as depressed with decreased energy and insomnia.

(*Id.* at 221-227) On December 1, 1998, on a "Value Behavioral Health Outpatient

Treatment Report," Dr. Cruz noted that plaintiff "presents with recurrent major

depression over past 8 years . . . continues to have severe decreased energy and

anhedonia with difficulty concentrating and hopelessness about work and marriage."

(*Id.* at 225) Dr. Cruz indicated plaintiff's current global assessment of functioning

("GAF")[3] as 42 with a high of 50 in the last year. (*Id.* at 224)

---

[3]The GAF scale ranges from 0 to 100 and is used by a clinician to indicate his
overall judgment of a person's psychological, social, and occupational functioning on a
scale devised by the American Psychiatric Association. American Psychiatric
Association, *Diagnostic & Statistical Manual of Mental Disorders* (Text Revision, 4th ed.
2000) (*DSM-IV-TR*). A GAF of 31-40 indicates "[s]ome impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major
impairment in several areas, such as work or school, family relations, judgment,
thinking, or mood (e.g., depressed man avoids friends, neglects family,
and is unable to work . . .)." A GAF of 41-50 indicates "[s]erious symptoms (e.g..
suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g., no friends, unable to
keep a job)." A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g. few friends, conflicts with peers or

2

In March 2000, plaintiff reported "slightly more energy," but with continued insomnia. (*Id.* at 221) In May 2000, plaintiff reported feeling "less depressed." (*Id.* at 219) In June 2000, plaintiff described waking up at one a.m. with vivid dreams and "remain[ing] depressed." (*Id.* at 219)

## 2. Mental health history during the relevant time period

In August 2000, plaintiff reported feeling "more depressed with decreased energy." She feared having a fatal illness. Plaintiff reported sleeping, but having vivid dreams. Dr. Cruz increased her medications. (*Id.* at 218) In September 2000, plaintiff reported relief that her medical work-up was negative, but described continued dreams. Dr. Cruz noted that plaintiff had no hypomanic symptoms. (*Id.*) In November 2000, plaintiff described depression "over [the] illness of [her] aunt's roommate." (*Id.* at 219) In December 2000, plaintiff reported feeling anxious about a "heavy workload" as her daughter was returning home. Plaintiff reported having low energy. (*Id.* at 219) In February 2001, plaintiff reported anxiety about her husband's potential layoff from work. (*Id.* at 216) In May 2001, Dr. Cruz noted that plaintiff remained depressed with decreased energy and insomnia. Plaintiff had decreased her psychotropic medication. Dr. Cruz noted adding medication to plaintiff's regime. (*Id.* at 215)

There are no medical records for plaintiff's mental health treatment from May 2001 to August 2002. Dr. Ralph Burdick D.O. ("Dr. Burdick") treated plaintiff during this time and his notes indicate that plaintiff's medication included Prozac, Ativan, and

_____

co-workers)." *Id.* A GAF of 61-70 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

3

Ambien. (*Id.* at 238, 240)

On August 1, 2002, plaintiff sought treatment from Peter Zorach, M.D. ("Dr. Zorach"), reporting feeling depressed daily for two weeks. (*Id.* at 270-71) Dr. Zorach assessed a GAF of 52 and prescribed psychotropic medications. (*Id.* at 271) On October 30, 2002, Dr. Zorach's impression was that plaintiff was "doing fairly well" with "some stress and anxiety, enough to be unpleasant." Plaintiff described keeping busy. (*Id.* at 269) On December 12, 2002, plaintiff reported feeling "somewhat better." Plaintiff denied suicidal ideation. (*Id.* at 268) Dr. Zorach noted plaintiff's condition was "improved." (*Id.* at 268) On January 17, 2003, plaintiff reported being "more depressed than not depressed." Plaintiff described spending time with her family over the holidays and working with floral arrangements. Plaintiff was deciding whether to work "2 days a week" or give up her work. (*Id.* at 267-68) On February 24, 2003, plaintiff reported "doing pretty well" and being in a "pretty good" mood. Plaintiff was working one day a week to "do some of [her] own business." Plaintiff described "cleaning up." (*Id.* at 267) On March 28, 2003, plaintiff cancelled her appointment. (*Id.* at 267)

## 2. Mental health after the relevant time period[4]

[4]Medical evidence after the relevant time period may be relevant to show a previous disability. *See e.g., Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) ("medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition"); *Wooldridge v. Secretary of HHS*, 816 F.2d 157, 160 (4th Cir. 1987) ("medical evaluations made two years subsequent to expiration of insured status are not automatically barred from consideration and may be relevant to prove a previous disability"); *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) ("medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status"); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (a diagnosis even several years after the actual onset of the impairment is entitled to

4

On April 16, 2003, plaintiff described some days as "not as good" and "[e]very day a fight." Dr. Zorach's impression was that plaintiff was "struggling" and "depressed," with low energy. On April 24, 2003, plaintiff reported that she was "still depressed," "never got up, showered, dressed." (Id. at 266-67) On June 9, 2003, plaintiff described being "no better and no worse." On June 24, 2003, plaintiff described "doing a little better." (Id. at 265) From July 21, 2003 to December 19, 2003, Dr. Zorach's impression of plaintiff was that she was "doing well" or "pretty well." (Id. at 263-64) On March 5, 2004, plaintiff reported "not doing so well," three to four days per week. (Id. at 262-63) On July 14, 2004, plaintiff reported "doing pretty well" with increased energy. (Id. at 260) Such pattern continued throughout Dr. Zorach's treatment ending on March 7, 2006, with plaintiff reporting "doing pretty much the same - still depressed." (Id. at 248-260)

On May 18, 2006, Carlene Tucker-Okine, Ph.D., reviewed plaintiff's file and concluded that there was "[i]nsufficient evidence to assess severity between [July 2000] and [March 2003]." (Id. at 277-89) Such opinion was affirmed by Pedro M. Ferreira, Ph.D., M.B.A. on July 18, 2006. (Id. at 291-301) On June 15, 2006, V. K. Kataria completed a "Physical Residual Functional Capacity Asessment," concluding that there was "[n]ot enough medical evidence to make [a] decision between [July 2000] and [March 2003]." (Id. at 272-276)

On September 21, 2007, Dr. Zorach completed a questionnaire concerning plaintiff's mental health impairments, expressing his opinion regarding "the entire

_____

significant weight); *Stark v. Weinberger*, 497 F.2d 1092, 1097 (7th Cir. 1974) (same).

treatment period."[5] Dr. Zorach treated plaintiff from August 2002 to March 2006[6] and described plaintiff's condition as "major depression, recurrent, severe," and "moderate, job stress." Dr. Zorach assigned plaintiff a GAF of 50 as of March 31, 2003 with a GAF "during treatment/at end of treatment" of 43. Dr. Zorach described plaintiff's treatment and response: "Initially appeared to respond to medicines but then became more depressed and dysfunctional, unable to work, sometimes hard to get up/get dressed/leave home." Dr. Zorach described his clinical findings: "[A]ppeared and sounded depressed; had feelings of being hopeless, helpless, lonely, worthless, shame; passive suicidal ideation." Plaintiff's prognosis was "guarded." (*Id.* at 325) In describing plaintiff's "mental abilities and aptitude needed to do particular types of jobs," Dr. Zorach noted: "[S]everely depressed - problem getting up and dressed in morning - problems with concentration - racing thoughts." For plaintiff's functional limitations, Dr. Zorach provided that plaintiff had marked restrictions in her activities of daily living, extreme difficulties in her ability to socially function, and extreme difficulties in her ability to maintain concentration, persistence, and pace. As to her episodes of decompensation, Dr. Zorach noted "persistently depressed." (*Id.* at 328) More

---

[5]The Third Circuit has held that retrospective evidence should not be automatically rejected. *Newell v. Comm. of Social Security*, 347 F.3d 541, 547 (3d Cir. 2003); *Sell v. Barnhart*, Civ. No. 02-8617, 2003 WL 22794702 (E.D. Pa. Nov. 17, 2003) ("retrospective opinions of treating physicians are entitled to deference," if such opinions are consistent with the record as a whole) (citing *Wilkins v. Secretary, Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); *Ricci v. Apfel*, 159 F. Supp. 2d 12, 20 (E.D. Pa. 2001); *Lukens v. Bowen*, 1987 U.S. Dist. LEXIS 2447 *6 (E.D. Pa. Mar. 13, 1987)).

[6]Encompassing a portion of the relevant time period of July 1, 2000 to March 31, 2003.

6

specifically, Dr. Zorach indicated that plaintiff was unable to meet competitive work standards in her ability to understand, remember, and carry out very short and simple instructions and ask simple questions. Further, Dr. Zorach provided that plaintiff had no useful functional ability to maintain regular attendance and punctuality, maintain attention for two hours, make simple work-related decisions, respond appropriately to routine work changes, accept instruction and criticism from supervisors, interact appropriately with the general public, and maintain socially appropriate behavior. (*Id.* at 327-28)

In August 2009, Brian Simon, Psy.D. ("Dr. Simon"), performed a psychological examination at the request of the state agency. (*Id.* at 336) Plaintiffs reported history was consistent with her hearing testimony described below. (*Id.* at 336-338) Dr. Simon documented that plaintiff was cooperative and well-groomed; she maintained good eye contact and her attention and concentration were fair throughout the examination; her mood was "a bit" dysphoric; her thought processes, insight, and judgment were intact. (*Id.* at 339) Dr. Simon assessed plaintiff as [b]ipolar II [d]isorder, [d]epressed, [i]n [p]artial [r]emission," with a GAF score of 55. Plaintiff's prognosis is "guarded" and "dependent on how well she is able to continue to cope with her psychiatric and medical problems." (*Id.* at 340)

From June to October 2009, plaintiff received treatment at Phoenix Behavioral Health. (*Id.* at 346-60) On June 8, 2009, a licensed social worker completed an evaluation form and assigned plaintiff a GAF of 53.[7] (*Id.* at 350) On July 3, 2009,

---

[7]With a highest GAF of 65 in the past year.

7

Archie Abashidze, M.D. ("Dr. Abashidze") described plaintiff as cooperative and friendly; maintaining eye contact; her behavior and motor activity were normal; her mood was normal; she denied suicidal ideation; her attention, concentration, and memory were intact; and her insight and judgment were good. Dr. Abashidze assessed her a GAF score of 70. (Id. at 353-55)

On November 18, 2009, Dr. Abashidze completed a mental health questionnaire. (Id. at 363) Dr. Abashidze's clinical findings were: "Episodes of major depression; sadness; hopelessness; and hypomania; . . .; [no] motivation; energy, . . . worthlessness." Plaintiff's prognosis was "poor to guarded." Dr. Abashidze provided that plaintiff had moderate difficulties in her activities of daily living, marked limitations in her social functioning, and marked limitations in her ability to maintain concentration, persistence, and pace. (Id. at 365-66)

Plaintiff's current medications include Ambien, Abilify, Effexor, Wellbutrin, Xanax, and Simvastatin. (Id. at 206-07)

## C. Administrative Hearing

### 1. Plaintiff's testimony

An administrative hearing was held on December 3, 2009. Plaintiff appeared, represented by counsel. (D.I. 8 at 24) Plaintiff was born on November 9, 1951 and was 58 years old at the time of the hearing. (Id. at 36) She graduated from high school in 1969. She worked as an ID fingerprint person, then as a secretary. After having children, she worked as a bookkeeper at a scrap yard. She then worked as a secretary for four years with "Catalytic" and thirteen years with "Getty" (the oil refinery in Delaware

8

City), performing typical clerical work. Plaintiff lives with her husband and has two children, 38 and 34 years old. (*Id.* at 25-26) In 2003, she weighed 160 lbs and now weighs 168. (*Id.* at 36) Both of her parents were alcoholics and her mother had depression. Her mother died at 57. She does not attend church. (*Id.* at 38)

Her husband is in good health. He is currently a maintenance manager for an assisted living home. He retired from Chrysler in 2001, where he worked on the line. (*Id.* at 39)

Plaintiff testified that she became ill in 1994, going "into a very, very deep depression to the point that [she] was non-functioning, and [she] lost a lot of time at work." She felt hopeless and worthless. She lacked motivation, had suicidal thoughts and did not function very well, staying in bed most of the time. She did not know what brought on her depression. She had a hysterectomy before her depression, but did not have anything major happen in her life. (*Id.* at 27, 37)

Because of the depression, she took "26 weeks of full pay" off twice within a period of three years. She would take time off and then return to work; she thought this "happened two or three times." (*Id.* at 27-28) She was let go in April 1996. Her doctor gave her permission to go back on a part-time basis, but there were no part-time positions available. She "probably could have" worked part time. (*Id.* at 28) After she lost her job, she "guess[ed] the depression became worse." She worked a series of jobs for short periods of time, but was let go as she "was very undependable." There were days she could not "get up and go to work or [she] got [to work] very late because [she] couldn't get out of bed in the morning." She last attempted to work in 1999. (*Id.*

9

at 29) She may have sold a few wreaths between 2000 and 2003 as she tried to have her own floral business. (Id. at 36)

Plaintiff received unemployment insurance in 1996 after she was severed from Getty, but did not receive worker's compensation. (Id. at 39) Plaintiff has not had any income since 2003.

Focusing on the time before March 2003, plaintiff described her depression as "totally debilitating, staying in bed all night and then getting up in the morning and going back to bed because [she] had absolutely no desire or motivation to do anything." (Id. at 29) She was under the care of Dr. Cruz and Dr. Zorach from 1999 to 2003, whom she saw weekly to bi-weekly for med changes, otherwise "usually once a month or once every six weeks." (Id. at 29-30) She also had a therapist, Deena Slade, who passed away from breast cancer, whom she saw "about every week" for about three years. She experienced a setback after Deena Slade passed away. (Id. at 30-31) She also saw therapist Jennifer Rock at Phoenix Behavioral Health in New Castle, who suddenly passed away from an aneurysm. (Id. at 31)

Before March 2003, plaintiff's average day consisted of "wak[ing] up when [she] woke up," getting up and having coffee, and "sometimes . . . go[ing] back to bed, and other times [she] would just sit and brood or cry." Her "day consisted of doing nothing." (Id. at 31-33) Plaintiff did not take care of herself on her bad days, which could last "days at a time." (Id. at 34) She slept eight hours, but was in bed fourteen to sixteen hours a day. Some days were better than others. A good day consisted of getting up, showering, maybe running the vacuum and maybe going outside to sit on the porch.

10

Plaintiff only had six or seven good days in a month. (*Id*. at 33) She did not have any problems sitting, standing, or walking. She imagines she had some weight gain, some hair loss, and the irritable bowel syndrome. (*Id*. at 38) She did not often cook meals or clean. Her husband did most of those things. He also did and still does the grocery shopping. (*Id*. at 31-32) She only went to her doctor's appointments. She would see a friend once a month or talk on the phone once a month. She felt isolated in her house. Out of the house, she experienced anxiety. (*Id*. at 32) Plaintiff has been on several medications, but does not recall what mediation she was taking between 2001 and 2003. (*Id*. at 37)

Plaintiff's current medication helps with her crying spells. She has tried "the gamut" of medications. While she does not "sit and cry and brood all the time, [she is] still very unmotivated and spend[s] an awful lot of time in bed." She has considered harming herself, thinking "it would be easier to be dead than alive, because being alive hurt so much." She still feels that way, although she does not feel suicidal right now. She does not think she will get better. She just started lithium and hopes that will work. (*Id*. at 34) She had irritable bowel syndrome, which is under control. (*Id*. at 37)

### 2. VE's testimony

At the hearing, the VE testified that, according to plaintiff's testimony, plaintiff has worked as a secretary, which is at a sedentary exertional level, skilled with an special vocational preparation ("SVP") of 6. Plaintiff's short-term part-time work as a florist is at a light exertional level, skilled, with an SVP of 6; a retail cashier is at a light exertional level, unskilled, with an SVP of 2. The VE opined that the secretarial position had

11

transferable skills. (D.I. 8 at 40)

The ALJ posed the following to the VE:

ALJ: I'd like for you if you would assume a person who is 48 years of age
on her onset date, which appears to be 7/1/00, has a 12th grade
education, past relevant work as indicated, . . . right handed.

. . .

Suffering mainly generally from depression. It causes her to have – has
anybody suggested you have a bipolar component or not?

PLAINTIFF: Yes. Bipolar too. I have hypomania [phonetic].

ALJ: Okay.

PLAINTIFF: –which doesn't happen very often.

ALJ: And she does have moderate depression with infrequent mood
swings and panic attacks during the period in question all of which is
somewhat relieved by her medications without significant side effects, but
she indicated she did have some weight loss or hair loss during the period
in question[], and if I find she needs to have simple, routine, unskilled jobs
during the period in question, low concentration, low memory, the kind of
jobs – SVP 2 jobs due to her depression. She seems to have been able
to attend tasks and complete schedules. However, the file indicates she
had mild to moderate ability to perform her ADLs and to interact socially
and to maintain her concentrations, persistence, and pace, and if I find
that she could lift ten pounds frequently, twenty on occasion, sit for an
hour, stand for an hour consistently, would have to avoid heights and
hazardous machinery but would've been able to do sedentary light work
activity with her limitations, can you give me jobs that such a person can
do in your opinion as a vocational expert?

(*Id.* at 40-42) The VE responded:

I would proffer the following. At the light exertional level the position of
library clerk. There are approximately 96,000 of those positions in the
national economy. Approximately 600 in the local economy.[8] . . .

_____

[8]The ALJ questioned the year from which the data was taken, requesting data
from 2000. The VE was using 2008 data, but had data from 2004. The VE testified
that she did not believe there would be a significant difference between 2003 and 2004.
The ALJ requested the 2004 data. (D.I. 8 at 42)

12

. . .

[In 2004,] I would say 96,000 still in the national economy. I would reduce it to 500 in the local economy. Mail sorter position, light, unskilled. There are approximately 140,000 of those positions in the national economy. Approximately 900 in the local economy. . . .

[which is t]he Delmarva Peninsula not including the northern neck of Virginia. Finally, the light unskilled position of copier operator. Approximately 17,000 of those positions in the national economy. Approximately 300 in the local.

. . .

At the sedentary exertional position I would proffer charge account clerk. Approximately 39,000 of those positions in the national economy. Approximately 300 in the local economy. The position of order clerk, sedentary, unskilled. Approximately 40,000 of those positions in the national economy. 350 in the local economy. Finally, the position of interviewer. Approximately 39,000 of those positions in the national economy. Approximately 350 in the local economy.

(Id. at 42-43) The ALJ then asked: "And all those jobs allow her to sit and stand

[inaudible] level I indicated." The VE responded, "but that is a variance to the Dictionary

of Occupational Titles, which does not define a sit/stand option." The VE was using her

"experience of placing people in these jobs or doing job analyses or observing workers

in these positions." The VE agreed with the ALJ that plaintiff "would not be able to do

any of her past work." (Id. at 43-44)

On cross-examination, the VE was asked to describe "any vocationally relevant

limitations" on a certain exhibit. (Id. at 44) The VE responded:

The physician is indicating that she's completely precluded from
completing a normal workweek, from engaging in sufficient concentration,
persistence, and pace to complete work tasks, to deal with any changes in
routine work settings, and that there would be at least three periods of
decompensation of two weeks or greater withing a twelve-month period,
marked difficulties with concentration, persistence, and pace, marked
difficulties with maintaining any kind of social functioning, also marked

13

difficulties with dealing with the public.

(*Id.* at 44-45) The VE was asked if "a person with those limitations [would] be able to

be employed" and responded that she did "not believe so." (*Id.* at 45) After reviewing

Dr. Zorach's impairment questionnaire, the VE testified:

This mental impairment questionnaire with residual functional capacities
indicates that the individual would not be able to have any useful function
in maintaining regular attendance or being punctual, would not be able to
sustain any routine office work even with special supervision, would not be
able to make even simple work-related decisions, would not be able to
perform at a consistent pace without an unreasonable number and length
of rest periods, would not be able to accept instructions and respond
appropriately to supervisors, would not be able to respond to any changes
in routine works settings, and would not be able to deal with standard
work stress. There's no useful ability to function in any of these factors.
That certainly indicates that there's no mental capacity for work. Further
there is an indication of extreme difficulty with social functioning, extreme
difficulties in maintaining concentration, persistence, and pace, and a
persistent depression that is greater than any of the categories for
episodes of decompensation throughout a 12-month period.

(*Id.* at 46) When asked specifically about the factors regarding "mental abilities and

aptitudes needed to do unskilled work," the VE testified that the inability to perform on

two or greater of the abilities would render the person unable to work. (*Id.* at 46-47)

## D. The ALJ's Findings

Based on the factual evidence and the testimony of plaintiff and the VE, the ALJ

determined that plaintiff was not disabled during the relevant time. The ALJ's findings

are summarized as follows:[9]

1. The claimant last met the insured status requirements of the Act on
March 31, 2003.

---

[9]The ALJ's rationale, which was interspersed throughout the findings, is omitted
from this recitation.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 1, 2000 thorough her date last insured of March 31, 2003 (20 C.F.R. §§ 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairment: depression (20 C.F.R. 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5. Through the date last insured, the claimant had the residual functional capacity to perform a range of sedentary to light work as defined in 20 C.F.R. § 404.1567(b), with lifting/carrying ten pounds frequently and 20 pounds occasionally, sitting for one hour and standing for one hour, consistently, through an eight-hour workday, five days a week, had to avoid heights and hazardous machinery, and was further limited to simple, routine, unskilled work with SVP 2 jobs which were low concentration and low memory.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on November 9, 1951 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled" through the date last insured, whether or not the claimant has transferable jobs skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed through the date last insured (20 C.F.R. § 404.1569).

11. The claimant was not under a disability, as defined in the Act, at any time from July 1, 2000, the alleged onset date, through March 31, 2003, the date last insured (20 C.F.R. § 404.1520(g)).

(*Id.* at 12-21)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190–91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of "evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477

16

U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Id.* at 250-51 (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the

17

[Commissioner]'s decision with or without a remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §

404.1520(a)(4)(1) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. See 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v . Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to h[er] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from

19

adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On January 16, 2010, the ALJ found that plaintiff was not under a disability within the meaning of the Act during the relevant time period from July 1, 2000 to March 31, 2003. The ALJ concluded that, despite plaintiff's "severe" impairment (depression), she had the residual functional capacity to perform a range of sedentary to light work for an eight-hour workday, five days a week, limited to simple, routine, unskilled work with SVP 2 jobs, with low concentration and low memory. After considering the VE's testimony, the ALJ found that, while plaintiff could no longer perform her past work, there were a significant number of other jobs in the national economy, including library clerk, mail sorter and copier operator at the light exertional level, and charge account clerk, order clerk, and interviewer at the sedentary exertional level.

Plaintiff contends that the ALJ erred in according more weight to Dr. Simon's

opinion than that of Dr. Zorach, plaintiff's treating physician during the relevant time, and Dr. Abashidze. Further, plaintiff contends that the ALJ's hypothetical question did not reflect all of plaintiff's impairments, therefore, the VE's testimony does not constitute substantial evidence. Defendant disagrees and contends that substantial evidence supports the ALJ's decision that plaintiff was not disabled under the Act during the relevant time.

### 1. Medical opinions

Plaintiff alleges that the ALJ improperly afforded the opinion of Dr. Simon significant weight over the contrary opinions of plaintiff's treating physicians. An ALJ should give "treating physicians' reports great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429). "[R]etrospective opinions of treating physicians are entitled to deference; [h]owever, the medical opinion must be consistent with the record as a whole." *Sell*, 2003 WL 22794702, at *2 (citations omitted). While contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright, such an opinion may be afforded "more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429. "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' The ALJ must consider all the evidence and give some reasons for discounting the evidence she rejects." *Id.* (citations omitted).

21

The ALJ acknowledged that Dr. Zorach was plaintiff's treating physician during a portion of the relevant time period, but declined to afford Dr. Zorach's opinion from the "Mental Impairment Questionnaire" ("questionnaire opinion") controlling weight. The ALJ reasoned that Dr. Zorach's questionnaire opinion was "not well supported by medical signs and laboratory findings and [wa]s inconsistent with his detailed treatment records." The ALJ focused on plaintiff's improvement with medication and counseling, noting statements from Dr. Zorach that plaintiff was doing "pretty well" and plaintiff's increase in GAF score during her treatment. Dr. Zorach's treatment notes for the relevant time period, which contain references to plaintiff's complaints without other details, are inconsistent with Dr. Zorach's conclusions that plaintiff had marked restrictions in daily living, extreme difficulties in concentration, persistence and pace, and could not meet competitive work standards. For example, the ALJ noted that Dr. Zorach's treatment notes indicated plaintiff "performed some household chores and was working part-time as a floral designer and planning to start her own business." Dr. Zorach's progress notes through the day last insured indicate no reported difficulties with concentration. Plaintiff discussed with Dr. Zorach attending church and interactions with her family.

The ALJ assigned significant weight to Dr. Simon's August 2009 opinion, but dismissed the contrary questionnaire assessment by Dr. Abashidze in November 2009. The court concludes that both of these evaluations, occurring some six years after the relevant time period, are too remote as to be helpful to the determination of plaintiff's condition during the relevant time period.

Plaintiff complains that the ALJ improperly relied on plaintiff's statements made

to Dr. Simon and record evidence which is not the focus of her disability (infrequent panic attacks, capability of getting along with others, lack of emotional deterioration at work, and no past difficulties with others). As discussed above, plaintiff's statements to Dr. Simon are consistent with her record testimony. The ALJ properly discussed factors, such as panic attacks and getting along with others, as these are relevant to plaintiff's overall diagnosis of depression and part of the medical records from her treating physicians.[10]

## 2. VE testimony

Plaintiff asserts that the VE's testimony does not constitute substantial evidence as the ALJ's hypothetical question did not reflect all of plaintiff's impairments.[11] Plaintiff points out that the VE testified based on the assessments of plaintiff's treating physicians that plaintiff would be disabled. To the extent that plaintiff argues that the ALJ's hypothetical did not take into account Dr. Zorach's questionnaire opinion, the court concluded above that such opinion was not supported by Dr. Zorach's treatment notes. Moreover, Dr. Abashidze's questionnaire opinion is too remote in time to be helpful. See Jones v. Barnhart, 364 F.3d 501, 505-06 (3d Cir. 2004) (the ALJ my disregard the response to a hypothetical which is inconsistent with the evidence in the

_____

[10]The ALJ recognized plaintiff's treatment by two therapists. Plaintiff argues that to the extent this was a basis for the ALJ's denial, the regulations require that Social Security make reasonable efforts to obtain the therapists' records. However, it is plaintiff's burden to show disability and make such records available for review. Money v. Barnhart, 91 F. App'x 210, 215 (3d Cir. 2004) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) ("The burden lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition.")

[11]Without specifying which impairment is missing.

23

record). The ALJ's hypothetical question described plaintiff's impairment as "moderate depression with infrequent mood swings and panic attacks during the period in question all of which is somewhat relieved by her medications without significant side effects." Such description is consistent with treatment notes from the relevant time period.[12]

The ALJ considered all the relevant evidence and adequately discussed the bases for his RFC determination in his findings and evaluation of the evidence. The court concludes that a careful review of the entire record provides substantial evidence, sufficient to support the ALJ's finding that plaintiff could perform a limited range of light work and that jobs existed in significant numbers in the national economy that she could have performed, and that she was not disabled from July 1, 2000 to March 31, 2003.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied. An appropriate order shall issue.

---

[12]Dr. Cruz initially described plaintiff as presenting with "recurrent major depression" in 1999. The other descriptors of plaintiff's condition as "major," "severe," or "persistent" are contained in the questionnaire opinions of Dr. Zorach and Dr. Abashidze.